Page number 21-5808, Robert Bledsoe v. Tennessee Valley Authority Board of Directors. Oral argument is not to exceed 15 minutes per side. Mr. Hamill for the appellant. Good morning. Doug Hamill for the plaintiff appellant, Robert Bledsoe. I'd like to reserve three minutes for rebuttal. Fine. This is an employment discrimination case in which we're asking this court to reverse summary judgment and remand for trial on the merits. To set the stage, let me begin by sharing three quotes from a key decision maker, Chris Dolman, who is speaking directly to my client, Bo Bledsoe. Bo, you need to go ahead and retire. I'm concerned about this disability you have, your condition with your liver.  I wouldn't think with your medical condition and your age that you would want to teach. I think your disability is slowing all this down. You're really too old to be doing this. Now, Dolman admitted that he wanted to remove Mr. Bledsoe from the training center, but he couldn't do this alone. He had to have the votes of the other three committee members. So how could he convince him? This is a case about a key decision maker who waits for a legitimate reason to materialize, here the ethics issue, and then uses it to cover up his true longstanding motivations for demoting the employee. Because Dolman had multiple unlawful motives, disability, age. What is the evidence? It seems to me it comes down, for me it comes down to, I guess it's Michael and Williams. Put aside Markham for a second. Just assume she's friends with Dolman and she's influenced by him. It takes all of their votes. What is the evidence that he, Dolman, that basically Michael and Williams kind of unwittingly adopted Dolman's view or rubber-stamped it or all the language that we use from the Cass Law cases? It's the influence that Dolman played. First of all, his position was unique and key. He was the operations training manager. In other words, his job was to oversee the whole training center and all the instructors. When Markham was asked why she didn't request an opinion on the ethics issue from Kevin Michael, she stated simply, he's not over the training center as Dolman was. In fact, Kevin Michael admitted that in this case that Dolman knew more about the instructors at the training center than he did. Obviously, Dolman's influence was heavy. If this court realizes the decision at the very beginning on November 30, 2017, when the LJTS had its first meeting, it was a split decision. It was Dolman and Markham who were adamant that Mr. Bledsoe had to be removed completely. It was Mr. Williams and Mr. Michael who were actually in favor of his transfer to the NLOR program to resolve the ethics issue. Here, the time, doesn't the fact that there was some time that went by, I mean, it shows that the, one argument I suppose would be it shows that the committee was thinking about the issue. They didn't, I mean, I think of a cat's paw situation as it's basically you're controlling the other person and they unwittingly, I think we've used the word, maybe I'm wrong about that, but you rubber stamp what this person is saying. It's just you're a conduit. And yet, this committee doesn't look like a conduit. They look like they're thinking about it. They're trying to figure out what to do. They have another person in the same boat, right, this Brown or whatever. How is it that, I mean, what did Williams say? I mean, I looked at his depot.  That I did whatever he said or I trusted him because he was the training guy and I'm, you know, I don't know. He's the union rep. He's looking out for what, so I assume, right? Well, I mean, in this case, again, if you're talking about the length of time, you can see the influence that Dahlman had over the decision maker because, you know, it was split in the beginning. And over time, as the discussions ensued, Dahlman's position won out. And, you know, it's important to know that all of these members testify that they had no expertise on ethics laws. In fact, what's really critical in this case is the fact that they could have easily reached out to the TVA ethics person to get an opinion as to whether or not transferring Mr. Bledsoe to the NLOR program would have violated the ethics or if it would have been an easy solution. They could have gotten a follow-up opinion is what you're saying? Yes. And what's key here is… Did you ask? I'm curious. Did somebody ask Markham in a depot why she didn't ask for a follow-up? Yes, I did, Your Honor. I asked her why she didn't follow and she said because management said it wasn't necessary. I asked her, and who are you referring to as management? Chris Dahlman and Jeremy Bailey. That's who she was relying on. In fact, her words were, quote, I heavily relied on the opinions of Dahlman and Bailey in deciding, hey, there's nothing we can do for Bledsoe. He's going to have to be removed. And so the influence of Dahlman is critical in this position. And, again, just the fact that TVA, these decision-makers could have easily asked for an ethics opinion. They never did. So they made a decision. Basically, they capitulated and let Dahlman make the decision, hey, we can't have Mr. Bledsoe in NLOR because that would be an ethical conflict. And, of course, we have provided the court, the district court, with a lot of evidence from other instructors who were in the licensed, non-licensed program. David Williams, who had been with this program for 10 years, all of them testified that this would not have been an ethics violation to allow Mr. Bledsoe to be in the NLOR program while his son was in the NSGPO program. How do we handle these cases going forward where you have, you know, these committees that make decisions as opposed to one decision-maker? And just in terms of the sort of facts that one would have to determine in terms of the influence that one person has. So let's say you have a committee of not four people, but a committee of 10 people, and the committee ends up voting unanimously to take action, adverse action of some sort, a motion like here. I mean, would you have to show that Mr. Dahlman influenced each and every committee member, you think? Because, you know, Williams is in kind of a different position here in terms of his advocacy. Right. I'm just wondering, going forward, where do we draw the line? Right. And, yeah, so the law has always been that you don't have to have proof of unlawful bias for each and every decision-maker. You can go to Reeves v. Sanderson Plumbing, the U.S. Supreme Court. In that case, there was evidence that one decision-maker out of a group of decision-makers had age bias, and that was good enough for the Supreme Court. I mean, the case of Gutzweiler v. Finnick is a very good example of where there were multiple people. I don't – I think there were at least five, maybe six different decision-makers in that case. Two were tainted with gender bias and their influence and their manipulation of the process, which here we had Dahlman manipulating the process by convincing Markham, you know, not to seek any further ethics opinions, to go with what he's telling her. And you can tell he was running the show, so to speak, manipulating the situation. A plaintiff would not need to show manipulation or influence as to each and every, let's say, ten committee members. Correct. Yes. In your view? Yes. I think – Even if it has to be unanimous, the decision? Correct. I mean, Your Honors, as you know, as a deliberating panel, I mean, there's always going to be a lot of discussion back and forth, and sometimes someone is, quote, the subject matter expert or someone has the stronger opinion, and that's what we see in Dahlman in this case. And again, he had a unique position among the four committee members, and ultimately he swayed the day. And we know that he was motivated by unlawful bias as well as retaliation, and he had a very close ally in Ms. Markham, who was a close personal friend. Again, we argue that the causation standard here is important. Because Dahlman had three illegal motivations, the district court erroneously applied the sole causation standard versus the but-for causation standard in Mr. Bledsoe's Rehabilitation Act claim. And by doing so, the district court foreclosed a finding of liability on the Rehab Act claim because there was more than one illegal motive at play. And this is a situation where the sole cause standard should not apply at all. First of all, Mr. Bledsoe brought his Rehab Act claim under Section 791, which doesn't even have a sole cause standard in it. That's under Section 794. But even if you look at Section 794, 794 subsection D says in employment discrimination cases, the ADA's causation standard should apply. So no matter if this court looks at it. Let's assume I agree with you, and I think it's a compelling argument given the text of the statute. Did it matter to the district court's decision, though? Because didn't the court apply both? I mean, it applied essentially the lesser standard, too, and granted summary judgment anyway. The but-for standard was applied to the age discrimination claim. Right, but would it have been consequential? My sense was it wouldn't have been consequential for the other claims. It was the same justification. It was the same. Well, I think it's important going forward. If this case goes to trial. Fair point. Fair point. Well, no, actually tell me about your saying going forward in your case. Yes, Your Honor. You go back. Yes. Why is that? Because the jury is going to hear. This is a split where the judge is going to hear the ADA claim. The jury is going to hear the Rehab Act and retaliation claims. If the jury is charged on sole cause, the jury is hearing age discrimination, retaliation. They can't say that disability discrimination was the sole reason that Mr. Bledsoe was removed from the training center because there were three reasons the jury could say. And the three reasons being age discrimination as well as retaliation. Yes, Your Honor. Yes, Your Honor. So it's critically important to this case and I think it's very important because this court has never addressed this issue and it's an important issue in federal sector employment cases such as this one. Thank you.  Good morning, Your Honor. Good morning. May it please the court. Kathleen Keogh Grebel appearing on behalf of Tennessee Valley Authority Board of Directors, the appellees in this matter. Regardless of the doctrinal framework which this court uses to analyze Mr. Bledsoe's discrimination claims, Mr. Bledsoe bears the ultimate burden to demonstrate that a reasonable jury could find he was a victim of illegal discrimination. He can't meet that burden here. Because the decision makers removed him based on an independent ethics opinion that Mr. Bledsoe agrees with, does not challenge, and that was equally applied to another employee. So I'd like to jump in to address some of the issues that the court discussed with my colleague. And so the first issue that I wanted to address was the issue of whether or not Mr. Dolman seized upon, you know, a legal issue or seized upon an issue to execute an illegal motive. And so for that proposition, the appellant relies on Hamilton v. General Electric. And in that case, the argument was, or in that case, the appellant disputed, heavily disputed the incident for which he was terminated. And the cases about seizing on an employee's performance are generally about performance and about that the employer will sort of over-surveil the employee and will, you know, ratchet up their surveillance on the employee and then, you know, seize on that motive. That's not what happened here. Yeah, but your opponent graphically summarized these comments of Dolman, which are very much going to the plaintiff's age and disability. And Dolman saying, why don't you retire? When are you going to retire? That kind of thing. So we have what you could call a smoking gun in terms of Dolman's comments. And your opponent's theory is that Dolman is waiting until something else comes up so that Dolman can then pursue his goal of removing the plaintiff from this highly prized teaching opportunity. I think the issue is whether or not Dolman's alleged discriminatory animus affected the ultimate decision of the committee. And I think the evidence here is clear that Mr. Michael and Mr. Williams used their own independent judgment and didn't supplant Mr. Dolman's judgment for their own. And I think Judge Nalbandian hit on the issue earlier, talking about, you know, Kevin Michael was an operations superintendent at TVA's nuclear power plant. He was very familiar with the staffing issues, very familiar. But didn't they testify, both of them, that Dolman was the training guy or he was the one that knew the most about the training programs? Mr. Michael testified that, yes, he knew more about the training program, but he testified that he knew personally the duties of the instructors. He testified that he'd gone through the program, that he was an operations superintendent, and that he had dealt with these conflicts of interest in the workplace and had managed these issues for several years. For a significant period of time. And so he was familiar with the program, maybe not as intimately as Mr. Dolman, but he was familiar with and used his own independent judgment to make the determination that they couldn't separate those two programs. And I think everybody agrees that Mr. Bledsoe couldn't perform that NSGPO position based on this ethics opinion. That's because his son was going to be a student in that program, right? Correct, that's right. So why couldn't the son be transferred to the other program where this training was being offered, as opposed to demoting the father and not giving the father the opportunity to teach a different course? I think the issue kind of illustrates exactly the problems that we deal with in the workplace of these conflict of interest rules. So the son never specifically asked to be transferred. The union representative testified he believed the list was set once they determined where they were going to give the offers to and which plants they were going to give the offers to. And so Mr. Bledsoe, Hudson Bledsoe, the child, never actually asked to be transferred to another plant. But did somebody go to him and say, hey, your dad's going to be demoted. I'm just curious. It seems like it would have been a solution. I do not know the answer to that. And by the way, the fact that there might be a solution out there suggests that maybe Dallman did see this as an opportunity to kind of get rid of a problem that he wanted to get rid of. I mean, couldn't a jury infer that? I think no. And I think that the reason that a jury couldn't infer that here is because an employer, once everybody realizes justifiably that there is an issue for the employee to continue in their job, an employer is faced with a myriad of things that you can do. And so the issue is whether or not TVA took a reasonable and considered decision. And here I think that they clearly took weeks to think about this and think about whether or not they could separate those programs as to remove the appearance of impropriety. I thought there was somewhere in the record, maybe I'm wrong, where at least TVA knew that possible transfer of Hudson was at least on the table. I mean, maybe he didn't make a specific request, but did Bledsoe not raise it with somebody? I just thought it came up that it was at least on the table as a possibility. He testified that he did bring it as a possibility, and Hudson Bledsoe in his interview filled out a form of which plants that he would prefer to go to. And he listed Sequoia as number one and Watts Bar as number two. And in his affidavit in the administrative EEO process, he testified that he told the union he preferred Sequoia because of the drive, but that he would go to either plant. He was willing to go to either plant, but he didn't affirmatively request. Isn't that kind of a distinction without a difference? I mean, he's saying I'll go to either one. Maybe he didn't make a specific request that I'd like to go to Watts, but he said he'd go to either one. I mean, that seems to be pretty close. Yes, Your Honor, I would agree with that. But I think the problem, and this is illustrating, like I said, the problem that we have dealing with managing these conflicts of interest in a federal nuclear power plant. But don't you also have a problem managing these interests in a federal nuclear power plant with having an employee like Dahlman making blatant ageist and disability-related comments about a worker who otherwise had nothing to do with it? I mean, how can you put a good record at the plant and say, when are you going to retire? How can you do this with your disability when there was no basis for those kinds of comments that have been presented to us? I think Your Honor is correct. And at the stage of this litigation, we have to accept that those happened. We dispute on the record that they did, but at this stage in the litigation, we have to assume that happened. And absolutely, those statements are reprehensible and inappropriate and should not have happened in the workplace. But there's a difference between inappropriate workplace comments versus whether or not they affected the ultimate decision. And I think here there's not evidence to connect to that ultimate decision. Well, just taking retaliation as an illustration. So the plaintiff goes to HR and complains about Dahlman. And HR – the HR person is this woman who's on the four-person board, right? Yes, Your Honor. And this woman is a friend of Dahlman and tells Dahlman that the plaintiff has been complaining about the ageist and disability-based comments. And then within, I think it's three months, this whole thing transpires. Am I right? I think the timing is important, Your Honor. First, the independent ethics opinion was given to the LJTS on November 21st. Mr. Bledsoe makes the complaint to – in the meeting with Ms. Markham and Jeremy Bailey and his union representative on November 27th. And then the meeting for the LJTS occurs on November 30th. So they were already contemplating – they already had the ethics opinion that said he could not serve in that NSGPO instructor role. So they were already contemplating, you know, what were they going to do? How were they going to alleviate and deal with this situation? So it was already an issue that they were contemplating. The decision to demote him was not made until afterwards, but was made in close proximity to somebody else – sorry that I'm forgetting people's names – but somebody else saying that, oh, you know, Dahlman is upset that you complained to Human Resources. Close proximity as in November, I believe that statement occurred, and then the decision occurred in February, February 21st. So that's three months. It was within three months. Yes, Your Honor. Yes. So doesn't that temporal proximity help in showing a retaliatory motive? I think it helps. It doesn't – it's not just positive. I think you still have to show that there's something else. There's something else connecting that decision because it wasn't so close in time. It wasn't – it were days or, you know, I think we're – and it was a committee decision. It wasn't the sole decision maker. So I think given the facts of this case, there needs to be something else to connect it as well. And that's what the district court found here. I'd like to talk about Ms. Markham a second, about her testimony. Appellant relies on the fact that she said she relied heavily. And I think if you look at the deposition testimony, she talked about – under questioning, she talked about that was her answer after she was asked whether it would be unethical for Robert Bledsoe to only teach his son's class. So we're still – we were talking about whether or not he could teach his son's class but not have any involvement in the exams. And then she testifies, well, I relied heavily on Christopher Dahman and Jeremy Bailey about what an instructor's duties were, not about something about Mr. Bledsoe personally or about his performance. What is your view on this question of whether the plaintiff has to show that every member of this committee was somehow a conduit or is it enough in a cat's paw theory with a committee to show that one or two people were conduits or rubber stamps? I think under a cat's paw theory, you need both intent and causation. So I think you'd still have to – it's a unanimous decision if we're talking about a committee with a unanimous decision. I think there needs to be evidence that those committee members – Any more on that question? I'm curious. I know that your opponent cites the tenure – there's a tenure case that Gutzweiler, whatever it is, that was – I think even predates Staub, if I'm not mistaken. But that was a tenure committee, right? Was that every member of that committee? I don't remember the exact facts, whether it was every member or what. But is there a case law that supports your position? I think actually Gutzweiler v. Fennick or Fennick v. Gutzweiler actually supports our position. And because in that case, you had a tenure committee where the chairman of the committee and another member of the committee who were both the lead members, essentially what the court said, of the committee. And they both were familiar – well, the chairman was the alleged discriminator as well as this other individual.  Everyone else on the committee testified. They hadn't read the professor's scholarship. They weren't as familiar with the professor's scholarship. And they relied on those alleged discriminators' version of the scholarship or relied on whether or not – So that's effectively evidence that everybody on the committee was tainted by the key – the discriminators, I guess, whatever you're saying. Right, Your Honor. And I think there's an important distinction – Was there a unanimity requirement on that committee? I don't know the answer to that, Your Honor. But I think there's an important distinction in that case, too, in that they were relying on whether the person's individual performance, their individual performance in the job, their individual academic scholarship. Here, they were relying on about the working group, Christopher Dahlman's information about the working group or instructor duties generally. I mean, I understand that. But if you go up one level of abstraction, I'm relying on Dahlman to tell me whether the NSGPO person can teach the NLOR or NLOR class, right? I mean, that's the argument, is that these instructors talk all the time. They share – they have access to the tests or whatever. I don't know. Whatever it is, I'm relying on Dahlman to give me those details, right? I mean, that's – it's the same as me relying on the chair of the department to tell me what the scholarship of this person is like because I don't know. I mean, isn't that just a situation where, yes, there's one person who happens to know more on the decision-making body, and that person happens to also be the discriminator? Isn't that a problem? I think there's a difference, Your Honor, and the difference would be that his advice or his discussion of the program equally applied to everybody in the program and equally applied to the other individual that we took the adverse action against. We didn't select for the NLOR position as well. So I think there's a difference. There's a difference between the information about one person that nobody else was super familiar with versus the information about the program generally that applied to everybody and that applied to this individual that we also took the action against as well. So are Brown and Bledsoe are the only ones of the names that have come out? And your opponent mentioned some other names too. Are those the only two that were in the non-licensed side of it with children or conflicts of interest? Have there been other people in the past that were in that exact same position, or were they licensed and the kid was non-licensed or vice versa? That's exactly it, Your Honor. There's no evidence that there's ever been an instructor while their covered person or student was in the non-licensed operator. And the other guy, Brown, he – but my understanding is he never had the position, right? He wasn't actually demoted. He just didn't get it. Correct, Your Honor. So we didn't select him, but that's still an adverse action that rights would attach to. So he could still receive the same, you know, discrimination – ability to claim discrimination as Mr. Bledsoe. I see that my time is up. If the Honors have any other questions, I would ask that you affirm the district court's ruling. Thank you. I want to take up an issue with the argument that somehow the committee made a reasonably informed decision on demoting Mr. Bledsoe. How can it be reasonably informed if they didn't even get an ethics opinion, which would have been extremely easy to do? Why did they not get an ethics opinion, Your Honors will see in the record, is because Dahlman influenced Markham not to do it. Even though, supposedly, ethically, he wasn't supposed to be doing this. Under the tenure of Chris Dahlman. Reasonably informed? No. Not at all. It seems like they would have been better off just demoting him the day after they got the opinion. And then, I mean, then that would have been okay? Well, one would think it at least would have been logical. But in this case, it was not logical at all. And, in fact, it cuts against them for them to claim that somehow there's an ethical impropriety for Mr. Bledsoe to be working on NLOR material even after this ethics opinion came out. How do we deal with the fact that Brown wasn't selected? Brown is not similarly situated to Bledsoe. First of all, as Your Honor pointed out, Brown had never worked in the training center in any instructor capacity. Mr. Bledsoe had been there for two and a half years. Mr. Brown did not have a demotion slash pay cut. Mr. Brown, there's no evidence in the record that his son was willing to transfer to Watts Bar as Hudson Bledsoe was willing to transfer. Do you agree that Brown not getting the position is, I mean, it's an adverse action, isn't it, not getting hired? It is, but it's not conclusive evidence that Mr. Bledsoe was not discriminated against based on his age, disability, and retaliation. That's the case in Rees v. Sanderson-Plumbing. Again, I go back to that case. But there, there were two other employees that the court noted who received disciplinary action for committing the same infraction. And the court noted, well, at trial, is it relevant evidence? Yes. Does that conclusively negate a finding of discrimination against the plaintiff? No. So Brown by itself is not an absolute defense for TVA in this case. And I believe my time is up if anyone has any other questions. Thank you. Thank you both for your argument, and the case will be submitted.